UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| NATHANIEL L. HURST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 4:20-cv-00080-MTS |
| | ) | |
| KILOLO KIJAKAZI[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of the final decision of Defendant, the Commissioner of Social Security, denying the application of Nathaniel L. Hurst ("Plaintiff") for Disability Insurance Benefits under Title II of the Social Security Act.

I. **Procedural History**

On August 1, 2016, Plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of October 1, 2014. (Tr. 10, 137). After Plaintiff's application was denied on initial consideration, he requested a hearing from an Administrative Law Judge ("ALJ"). (Tr. 10, 85–86).

Plaintiff and his counsel appeared for an in-person hearing before the ALJ on August 14, 2018. (Tr. 10, 26–61). Plaintiff testified concerning his disability, daily activities, functional limitations, and past work. A vocational expert, K. Stephen Dolan, provided answers to interrogatories after the hearing. In a decision dated May 1, 2019, the ALJ concluded Plaintiff was not disabled under 42 U.S.C. §§ 416(i) and 423(d). (Tr. 7–25). The Appeals Council denied

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of the Social Security Administration and is substituted for Andrew Saul as defendant in this action. *See* Fed. R. Civ. P. 25(d).

Plaintiff's request for review on November 18, 2019. (Tr. 1–6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

II.     **Evidence Before The ALJ**

    A.     **Disability and Function Reports and Hearing Testimony**

Plaintiff was born in October of 1970 and was age forty-three at the time of the alleged onset in 2014. (Tr. 19). He has a high school equivalency education and has worked as an electrician, landscaper, handyman, machinist apprentice, home inspector, and real estate agent. (Tr. 30, 36–39, 77–76). He lived with his wife and teenage son, who has Asperger Syndrome. (Tr. 14, 460, 463). He claimed disability due to depression, anxiety attacks, hip injury, back injury, neck injury, and high blood pressure. (Tr. 80). He reported taking a number of medications, including Advil, albuterol, bupropion ccl xl, duloxetine hcl dr, hydrocodone, lisinopril-hctz, and tramadol. (Tr. 171). In March of 2018 he was prescribed meloxicam. (Tr. 239).

In his November 2016 Function Report, (Tr. 200–213), Plaintiff listed depression, anxiety, panic attacks, high blood pressure, hip pain, sciatica in the right leg, lower back pain, bone spurs in the neck with diminished range of motion, and pain in the right shoulder rotator cuff as illnesses or conditions that limited his ability to work. (Tr. 202–03). His daily activities, he reported, started by rising at nine in the morning. (Tr. 204–05). He would then complete household tasks and chores, clean up after his son, cook meals, and run errands. (*Id.*). He reported trying "to do something every day to keep active," like cutting the grass, doing laundry, or washing dishes. (*Id.*). Activities, he reported, took him longer to complete and required a day or two afterwards to recover from them. (*Id.*). Plaintiff reported difficulties lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and getting along with others. (Tr. 207–08). Plaintiff reported he had trouble sleeping and had the need to get up every couple hours. (Tr. 204).

Plaintiff reported that he was able to care for his teenage son along with two family dogs. (Tr. 204). Plaintiff had no problem with his own personal care and did not need any special reminders to take care of his personal needs and grooming. (Tr. 205). He could drive a car, pay his bills, handle a savings account, count change, and use a checkbook. (Tr. 206). He could walk one-thousand feet before needing to rest for three minutes, and he occasionally used a cane. (Tr. 208). He does not spend time with others socially, aside from his family. (Tr. 207). He has problems being around people he does not know, and he does not want to talk to or be around more than one or two people at a time. (*Id.*). He follows written and spoken instructions well and has no problem getting along with authority figures. (Tr. 208). He has been fired from a previous job because of an altercation with another employee. (Tr. 208). He can also handle both stress and changes in his routine. (Tr. 209). His hobbies included hunting, fishing, and being outdoors; however, he reported he did not participate in these activities often and can no longer go very far into the woods to do so. (Tr. 207).

In the August 2018 hearing, Plaintiff testified about his afflictions as follows. He said that he had hip problems because of a flattening of the femoral head. (Tr. 40–42). While a corrective operation for the condition exists, Plaintiff weighed too much to undergo it. (Tr. 42). Plaintiff occasionally uses a cane to walk since his hip goes out and he struggles to walk long distances. (Tr. 45). He has asthma and can walk about a block before getting winded and needing a break. (Tr. 45). Plaintiff can stand and sit for 30 minutes to one hour before experiencing sciatica. (Tr. 47). He also has pain in his right shoulder. (Tr. 43). If he moves it too much in the wrong direction, he experiences sharp pains that distract him from tasks he must perform. (Tr. 43). Plaintiff can grab items but cannot lift them. (Tr. 44). In order to complete tasks such as showering and dressing he must move at a slow pace. (Tr. 43). Plaintiff experiences pain in his neck, and he

has lost two inches in height. (Tr. 44). Plaintiff also has mild sleep apnea and has a controlled positive airway pressure (CPAP) machine, which has improved his condition. (Tr. 51–52). Plaintiff has struggled with depression and anxiety since childhood. (Tr. 47). Around 2013, his depression and anxiety exacerbated, but medication he took allowed him to "feel better." (Tr. 49). The medication prescribed by his psychiatrist has helped him. (Tr. 51).

The ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b) except he should never climb a ladder, rope, or scaffold. He should never be required to crawl. He could only occasionally climb ramps and stairs, stoop, kneel and crouch. He could only occasionally push and pull with his right upper and lower extremities. He could only occasionally reach overhead with his right upper extremity. He should avoid concentrated exposure to extreme heat, extreme cold, humidity and vibration. He should avoid even moderate exposure to pulmonary irritants, such as gases and fumes, and he should avoid hazards, such as unprotected heights and unprotected moving machinery. He was limited to routine, repetitive tasks, which he could perform for at least two hours at a time. In addition, Plaintiff was limited to only occasional interaction with supervisors, co-workers and the public.

Vocational expert J. Stephen Dolan answered interrogatories about the employment opportunities for a hypothetical person of Plaintiff's age, education, work experience, and with Plaintiff's residual functional capacity as determined by the ALJ. (Tr. 242–46). Mr. Dolan testified that such a person would not be able to perform Plaintiff's past relevant work as a medium-duty skilled electrician, a light-duty skilled real estate agent, a medium-duty unskilled small product assembler, and a medium-duty skilled house repairer. (Tr. 19). Mr. Dolan also

answered that such a hypothetical individual could perform jobs available in the national economy, including housekeeping cleaner, mail room clerk, and hand packager. (Tr. 20).

In response to other questions by the ALJ Mr. Dolan opined that being off task more than 20% of the time as a housekeeping cleaner or mail room clerk and being off task at all as a hand packager would preclude employment in those jobs. (Tr. 255). Further, he answered that more than two unexcused absences a month or regularly reoccurring unexcused absences would preclude employment in those jobs. (Tr. 255). Mr. Dolan further answered that if the individual could have no public contact, could only occasionally have casual contact with co-workers and supervisors, could not perform tandem tasks or team work, could not work under close supervision, and could not engage in fast pace work or work that requires production quotas, then all of the above jobs would be eliminated. (Tr. 264). Mr. Dolan stated that his testimony was consistent with the Directory of Occupational Titles (DOT) as well as use of his vast experience to determine limitations and job numbers not addressed in the DOT. (Tr. 20).

**B.     Medical and Opinion Evidence**

Prior to his alleged onset of disability, Plaintiff's medical providers had diagnosed him with multiple conditions. He had been diagnosed with asthma, seasonal allergic rhinitis, benign essential hypertension, generalized anxiety disorder, depressive disorder, and non-alcoholic fatty liver disease. (Tr. 274). He also had reported chronic lower back pain and had a history of calculus of kidney. (*Id.*).

Dr. Arjun Bhattacharya performed a consultative examination on Plaintiff in January 2017. (Tr. 450–459). Dr. Bhattacharya did not offer any opinion on Plaintiff's functional limitations. Dr. Bhattacharya's indicated his clinical impressions were that Plaintiff had uncontrolled hypertension, but with no end organ damage, impingement of the right shoulder, decreased range

5

of movement and some arthritis of the cervical spine, and "no deformity" of the back along with "no neurological deficit." (Tr. 453). The ALJ gave Dr. Bhattacharya's opinion significant weight.

Mark Altomari, Ph. D., performed a medical evaluation for the agency in January of 2017. (Tr. 68). He found that Plaintiff had a mild limitation in mental function and a moderate limitation in concentration, persistence, and pace. (Tr. 67). He further found that Plaintiff had a mild limitation in all other areas evaluated. (*Id.*). Dr. Altomari performed a Mental Residual Function Capacity Assessment on Plaintiff. (Tr. 74–75). He determined that: (1) Plaintiff had no understanding or memory limitation but had sustained concentration and persistence limitations; (2) Plaintiff was not significantly limited to carry out short and simple or detailed instructions, or to sustain an ordinary routine without special supervision; (3) he was not significantly limited in making work-related decisions, completing a normal workday or week without interruptions from psychologically based symptoms, or performing at a consistent pace without any unreasonable amount or length of rest period; (4) he was moderately limited in maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerance; (5) he was moderately limited to work in coordination with or in proximity to others without being distracted by them; (6) he had social interaction limitations including moderate limitation in interaction with the general public, accepting instruction, and responding to criticism from supervisors; (7) he was not significantly limited to asking simple questions or requesting assistance and could get along with coworkers and peers without distracting them or exhibiting behavioral extremes; (8) he was not significantly limited in maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, and had no adaption limitations. (Tr. 67–75). The ALJ afforded Dr. Altomari's opinion great weight since it was generally consistent with the medical evidence. (Tr. 13).

Joann Mace, M.D., evaluated Plaintiff's medical history for the agency in January of 2017. She found that Plaintiff's conditions resulted in some limitations to his ability to perform work related activities. (Tr. 77). Plaintiff's condition, she concluded, was not severe enough to disqualify him from working but just limited him to light work. (Tr. 77). Dr. Mace performed a Physical Residual Function Capacity Assessment on Plaintiff. (Tr. 70–74). Among other conclusions, she determined that Plaintiff could lift or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk (with normal breaks) for 6 hours in an 8-hour day, and sit (with normal breaks) for 6 hours in an 8-hour day. (Tr. 70). The ALJ gave this evaluation great weight since Dr. Mace "prepared a detailed report" after "a thorough review" of Plaintiff's medical history and came to conclusions consistent with the medical evidence. (Tr. 17).

Georgia Jones, M.D., performed a consultative psychiatric examination in January of 2017. (Tr. 460–466). Dr. Jones described Plaintiff as "neat, clean and well groomed." (Tr. 14, 462). She concluded Plaintiff had major affective disorder and recurrent and severe depression. (Tr. 464). Dr. Jones assigned a Global Assessment of Functioning (GAF) score of 55. (Tr. 14, 462). The ALJ gave Dr. Jones's opinion some weight since Dr. Jones's observations illustrate, according to the ALJ, that Plaintiff's mental impairments were not debilitating during the relevant period. (Tr. 14).

Scott Jones, M.D., performed psychiatric evaluations on Plaintiff as Plaintiff's treating psychiatrist. He opined that Plaintiff was "totally and completely disabled." (Tr. 686). The ALJ afforded this opinion minimum weight because the determination of whether a claimant is disabled is reserved for the Commissioner of Social Security. (Tr. 18). Further, the ALJ stated that the medical records do not support Dr. Jones's finding. (*Id.*).

**III.** **<u>Standard of Review and Legal Framework</u>**

To be eligible for disability benefits, Plaintiff must prove that he is disabled under the Social Security Act. *Baker v. Sec'y of Health & Hum. Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove: (1) he is not currently engaged in substantial gainful activity; (2) he suffers from a severe impairment; and (3) his disability meets or equals a listed impairment. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *see also Bowen*, 482 U.S. at 140–42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. *Pate-Fires*, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." *Moore*, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ must determine whether the claimant can return to his past relevant work. 20 C.F.R. § 404.1520(e). If the ALJ finds at step four that a

claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); *see also* 20 C.F.R. § 404.1520(f).

The court's role on judicial review is to decide whether the ALJ's determination is supported by substantial evidence on the record as a whole. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007); *see also Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the ALJ's decision. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has emphasized repeatedly that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010) (quoting *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." *Id.*; *see also Stewart v. Sec'y of Health & Hum. Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, the court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence record. *Buckner v. Astrue*, 646 F.3d 549, 556

(8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. *Id.*; *see also McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome").

IV. **The ALJ's Decision**

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that Plaintiff met the insured status requirement through June 30, 2018 and had not engaged in substantial gainful activity since October 1, 2014. (Tr. 12). At step two, the ALJ found that Plaintiff had several severe impairments, including degenerative disc disease of the cervical and lumbar spine, degenerative joint disease of the right knee and shoulder, asthma, and morbid obesity. (*Id.*). The ALJ determined that several of Plaintiff's other diagnoses were not severe. His hypertension and obstructive sleep apnea were well controlled with medication and a CPAP device, respectively. (*Id.*). Further, the ALJ concluded that "[n]othing convincing exist[ed] in the record to suggest [they] caused any functional limitations" to Plaintiff. (*Id.*). The ALJ further found that Plaintiff's mental impairments caused no more than "mild" limitation in any of the "four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders." (Tr. 13–14.). Thus, considered both singly and in combination, the ALJ concluded that Plaintiff's depression and anxiety disorder were non-severe since they did not cause more than a minimal limitation on his ability to perform work-related activities. (*Id.*). At step three the ALJ determined that Plaintiff, through his date last insured, did not have an impairment or combination

of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. (Tr. 14).

Next, the ALJ determined that Plaintiff, through his date last insured, had the RFC to perform light work with exceptions. (Tr. 15). Plaintiff could not climb ladders, ropes, or scaffolding and should not crawl. *Id.* Further, he should avoid even moderate exposure to pulmonary irritants, such as gases and fumes, and should avoid hazards, such as unprotected heights and unprotected moving machinery. *Id.* He could occasionally climb ramps and stairs, stoop, kneel, crouch, push and pull with his right upper and lower extremities, and reach overhead with his right upper extremities. *Id.* Plaintiff was limited to routine, repetitive tasks, which he could perform for at least two hours at a time, and he was limited to occasional interaction with supervisors, co-workers, and the public. *Id.* The ALJ concluded step four by finding that Plaintiff was unable to return to any of his past relevant work. (Tr .19).

At step five, the ALJ summarized the medical records, Plaintiff's written reports, and testimony regarding his abilities, conditions, and daily life. (Tr. 15–19). The ALJ found at step five that through his date last insured, considering Plaintiff's age, education, work experience and RFC, there were jobs in the national economy that Plaintiff could have performed during the relevant period, including light-duty housekeeping cleaner, light-duty mail room clerk, and light-duty hand packager. (Tr. 20). Therefore, the ALJ found that Plaintiff was not disabled, as defined in the Social Security Act, at any time from October 1, 2014, the alleged onset date, through June 30, 2018, the date last insured. (Tr. 21).

**V.**   **Discussion**

Two specific issues exist between the parties in this case: (1) whether the ALJ failed to develop the record fully and fairly, and (2) whether the ALJ failed to evaluate credibility properly.

## A. The ALJ Fully and Fairly Developed the Record

Plaintiff argues that the ALJ did not fully and fairly develop the record because she gave "great weight" to the January 2017 evaluation of Dr. Mace though Plaintiff "underwent additional physical and mental health treatment, objective medical testing[,] and surgery," all of which reduced his RFC, after the evaluation. Doc. [15] at 4. Plaintiff further argues that the ALJ erroneously attempted to interpret the results of a December 26, 2018 MRI scan herself.

The ALJ has a duty to develop the record fully and fairly. *Mouser v. Astrue*, 545 F.3d 634, 639 (8th Cir. 2008). When determining residual functional capacity "all the evidence in the record" should be reviewed, including "the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)). The ALJ afforded Dr. Mace's January 2017 evaluation for the agency "great weight" because she performed a "thorough review" of Plaintiff's "medical history." (Tr. 17). Plaintiff fails to point to anything within the record that the ALJ missed or should have considered but did not. Though the ALJ gave great weight to Dr. Mace's evaluation—which took place in January 2017—the ALJ recognized that Plaintiff underwent additional treatment, testing, and a procedure after Dr. Mace's evaluation. The ALJ specifically wrote what occurred after Dr. Mace's review and explained why she weighed those events as she did. For instance, in the decision, she noted Plaintiff's May 2017 diagnosis of a meniscal tear and his subsequent arthroscopic surgical intervention in June 2017. But she added that, after the surgery, Plaintiff exhibited a normal gait, a good range of motion, strength in his knee, and had only mild pain. (Tr. 18).

The ALJ also discussed in the decision that Plaintiff continued to have chronic joint pains after Dr. Mace's 2017 evaluation; however, she also considered the imaging of Plaintiff's right hip

12

from May 2018 showing only mild degenerative joint disease. Imaging on his shoulder from that same month appeared unchanged from imaging conducted two years earlier, while imaging of his spine showed only a "slight" progression of his degenerative disc disease. (Tr. 18). As for Dr. Scott Jones's April 2018 declaration that Plaintiff was "totally and completely disabled," the ALJ afforded it minimal weight since, as she correctly concluded, such a determination is reserved for the Commissioner of Social Security. *Stormo v. Barnhardt*, 377 F.3d 801, 806 (8th Cir. 2004).

By the very nature of the disability application and evaluation process, there will invariably be delays between some medical evaluations and the ALJ's review. Such a delay does not prevent the ALJ from relying on those evaluations. *See, e.g.*, *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011). Here, the ALJ specifically discussed the things that occurred after Dr. Mace's 2017 medical evaluation and did so even though she was "not required to discuss in detail every piece of evidence submitted." *Nishke v. Astrue*, 878 F. Supp. 2d 958, 981 (E.D. Mo. 2012). In this case, the ALJ fairly and fully developed the record through review of medical opinions and documentation.

Plaintiff also takes issue with the results of an MRI he obtained on December 26, 2018. As the ALJ noted, Plaintiff underwent this imaging six months *after* his date last insured. Plaintiff was required to establish he was disabled *prior to* the expiration of his insurance in order to be entitled to disability insurance benefits. *Moore*, 572 F.3d at 523; *see also Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). Thus, Plaintiff must establish a disability between the onset date of October 1, 2014 and his date last insured, June 30, 2018.

Plaintiff argues that, given the degenerative nature of his condition, the MRI showed disease that developed over a period of time. "[E]vidence concerning ailments outside of the relevant time period can support or elucidate the severity of a condition." *Pyland v. Apfel*, 149

13

F.3d 873, 878 (8th Cir. 1998). By the very nature of a degenerative disease, though, subsequent imaging or examinations will almost invariably show worsening of the condition. Imaging conducted six months outside the coverage window can only offer so much. Importantly here, the MRI was not the first imaging or test performed on Plaintiff's cervical spine. Plaintiff's medical history detailed the condition of his cervical spine over many months. In fact, Plaintiff had imaging performed on his cervical spine in May 2018, just one month before the closure of his coverage window and seven months before the MRI. That imaging showed only "slight" progression of Plaintiff's cervical degenerative disc disease compared to a November 2016 scan. This information, along with other evidence and opinions regarding Plaintiff's cervical spine, was considered by the ALJ.

What is more, the ALJ did view the results of the MRI and noted that it showed only "borderline/mild cord compression" with no signal cord abnormality. Plaintiff argues that the ALJ was "playing doctor" by considering the MRI results herself and that she should have obtained a medical expert "to interpret the MRI results." Doc. [15] at 6, 8. Plaintiff mischaracterizes what the ALJ did. The ALJ did not *interpret* the MRI results. She quoted from the impressions of the physician who interpreted the images. (Tr. 817–18). It is true that an ALJ cannot draw their own inferences about a claimant's functional ability simply from medical reports, *Combs v. Berryhill*, 878 F.3d 642, 646 (8th Cir. 2017), but, as Plaintiff acknowledged, see Doc. [15] at 9, objective medical findings and other medical evidence can constitute sufficient medical support for an RFC assessment even in the absence of medical opinion evidence. *See Steed v. Astrue*, 524 F.3d 872, 875–76 (8th Cir. 2008). Given the amount of evidence in the record concerning Plaintiff's cervical spine, detailed over a significant period of time, including the imaging performed shortly before his date last insured, and the medical opinions on the same, the ALJ was not required to obtain a

specific medical opinion on the MRI results performed six months after Plaintiff's date last insured. *See Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 562 (6th Cir. 2014) ("As the ALJ properly reviewed and weighed the reports to make a legal determination that is supported by substantial evidence, the assertion that the ALJ was 'playing doctor' is unsupported.").

### B. The ALJ Properly Evaluated Credibility

Plaintiff next argues that the ALJ's analysis of the medical evidence and independent function show a failure to evaluate the objective and subjective evidence that supports Plaintiff's allegations. Further, Plaintiff argues that the ALJ failed to evaluate the credibility of certain medical opinions.

When evaluating subjective allegations of pain, an ALJ must consider "the claimant's prior work history; daily activities; duration, frequency, and intensity of pain; dosage, effectiveness and side effects of medication; precipitating and aggravating factors; and functional restrictions." *Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) (quoting *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998)). The absence of objective medical evidence to support the claim must be considered, but the ALJ cannot discount subjective complaints solely because they are unsupported by the objective medical evidence. *Halverson v. Astrue*, 600 F.3d 922, 931–32 (8th Cir. 2010) (citing *Mouser*, 545 F.3d at 638). Further, "an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." *Jones v. Astrue*, 619 F.3d 963, 975 (8th Cir. 2010) (quoting *Baker v. Barnhardt*, 457 F.3d 882, 892–93 (8th Cir. 2006)).

The ALJ considered the proper factors in evaluating Plaintiff's subjective allegations of pain, and the Court concludes that substantial evidence supports her determination that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms are not

entirely credible. *Bryant v. Colvin*, 861 F.3d 779, 782 (8th Cir. 2017). The ALJ described Plaintiff's own reporting of his day-to-day life. He reported that he did household chores and household repairs along with cleaning up after his son, caring for his pets, cutting the grass, doing laundry, washing dishes, and cleaning. (Tr. 204–05). When asked at the hearing who does the household chores, he stated "[p]retty much, me." (Tr. 32). Plaintiff also reported he cooked a variety of foods daily and that it takes him a "normal" time to do it. (Tr. 205). At the hearing when asked who did the cooking for the household he again answered "[p]retty much, me." (Tr. 32). In addition, Plaintiff reported having no problems tending to his own personal grooming needs.

"[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain." *Medhaug*, 578 F.3d at 817; *accord Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (concluding "daily activities [such] as getting up, eating, reading, cleaning the house, making the bed and doing dishes with the help of [a spouse], making meals, visiting with friends, and occasionally shopping and running errands" are inconsistent with a claimant's subjective complaints of disabling pain). "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001). In addition, the ALJ noted that Plaintiff stopped his long-term work as an electrician not because of his pain but "due to problems with his son, which caused him to miss work too often." (Tr. 14); *accord* (Tr. 32–33). The ALJ was able to observe Plaintiff during his testimony at the hearing, and his testimony, in addition to the medical evidence, convinced the ALJ that Plaintiff was not fully credible and could perform some light work. "The ALJ is in the best position to make this determination," and the Court cannot say the ALJ erred in doing so here. *Steed*, 524 F.3d at 876; *accord Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002).

Finally, Plaintiff argues that the ALJ erred regarding her conclusion on the credibility of Plaintiff's treating psychiatrist, Dr. Scott Jones. Dr. Jones concluded that Plaintiff was "totally and completely disabled." (Tr. 686). While treating physicians are entitled to controlling weight if they are supported by substantial medical evidence, *Stormo*, 377 F.3d at 805 (citing *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001)), treating physician opinions should not be credited when they state a claimant cannot be gainfully employed or is disabled. *Stormo*, 377 F.3d at 806. Such conclusions are "opinions on the application of the statute, a task assigned solely to the discretion of the [Commissioner]." *Id.* (quoting *Krogmeier*, 294 F.3d at 1023) (alteration in original). Here, the ALJ properly discounted Dr. Scott's legal conclusion.

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 16th day of July 2021

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE